**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| RTD MIDDLEBURG HEIGHTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 23-2135 |
| | ) | |
| THE UNITED STATES, | ) | Filed: August 16, 2024 |
| | ) | |
| Defendant. | ) | Re-issued: August 28, 2024* |

<u>**OPINION AND ORDER**</u>

In this post-award bid protest, Plaintiff RTD Middleburg Heights, LLC ("Middleburg") contends that the General Services Administration ("GSA" or "Agency") improperly awarded a lease for office space to awardee Michael Downing Realty, Ltd. ("Michael Downing"). Specifically, Middleburg alleges that GSA's price evaluation was flawed, GSA's use of a Cost-Benefit Analysis was arbitrary and capricious, GSA's price evaluation was inconsistently and inadequately documented, and that GSA disparately evaluated the offerors' lease proposals. Before the Court are the parties' Cross-Motions for Judgment on the Administrative Record. As explained below, the Court **GRANTS IN PART AND DENIES IN PART** Middleburg's Motion and **DENIES** the Government's Cross-Motion.

## I.   BACKGROUND

### A.   The Solicitation

On October 23, 2019, GSA issued Request for Lease Proposals No. 7OH2414 ("RLP" or "Solicitation") for the award of a 15-year lease of office space in the Middleburg Heights, Ohio,

---

*  The Court issued this opinion under seal on August 16, 2024, and directed the parties to file any proposed redactions by August 23, 2024. As the parties did not propose any redactions, the Court reissues the opinion publicly in full.

area to be used by the Social Security Administration ("SSA").  Admin. R. at 4, ECF No. 17.[1] GSA sought to lease a minimum of 6,363 to a maximum of 6,681 American National Standards Institute/Building Owners and Managers Association office area square feet ("ABOA SF") of contiguous space.  *Id.*  The RLP contemplated a fully serviced lease, with rent based on a proposed rental rate per Rentable Square Foot ("RSF"), limited by the maximum ABOA SF solicited under the RLP.  AR 6.

The RLP stated that the lease would be awarded to the offeror with the lowest-priced, technically acceptable proposal.  AR 20.  Offerors were instructed to provide pricing information on GSA Form 1364 "Proposal to Lease Space," GSA Form 1217 "Lessor's Annual Cost Statement," and on a Security Unit Price List.  AR 15–16.  As relevant here, the Solicitation instructed offerors to "[c]omplete all sections of the 1364, including but not limited to: [a] fully serviced Lease rate (gross rate) per ABOA and RSF, clearly itemizing the total Building shell rent, [Tenant Improvement] rate, Building Specific Amortized Capital (BSAC) rate, operating costs, and parking[.]"  AR 15.

Although the Solicitation provided certain information on Tenant Improvement ("TI") requirements, the TIs to be delivered by the awardee would "be based on [a] final design to be developed after award of the Lease, which [would] reflect[] the Agency's full requirements."  AR 6.  The RLP defined TIs as the "finishes and fixtures that typically take Space from the shell condition to a finished, usable condition."  AR 19.  The Solicitation advised that "Lessor shall design and build the TIs and will be compensated for TI costs, together with design and project management fees to be set under the Lease."  AR 6–7.  But for purposes of the proposals, offerors

---

[1] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers.

were required to "provide the allowance stated in the Tenant Improvement Allowance paragraph of th[e] lease."  AR 7.  That allowance equaled $43 per office space square foot to be used "for the build-out of the Space in accordance with the Government approved design intent drawings."  AR 19.

The RLP also required offerors to quote a lump sum for Building Specific Amortized Capital ("BSAC"), which consists of certain security items that are part of or attached to a building and cannot be easily moved and which would be amortized into the rent.  AR 16.  The RLP specified these BSAC security measures as encompassing the design, installation, and maintenance of a closed-circuit television system, an intrusion detection system, and a duress alarm.  AR 1132–38.  Offerors were instructed to propose unit prices for each item, the total of which was to be entered on the BSAC line of Form 1364.  AR 1139–40; *see also* AR 15.

To determine the lowest-priced offeror, the RLP advised that GSA would use a present value price evaluation that considered various additions and deductions to the gross present value cost ("gross PVC") of each proposal.  AR 21.  Specifically, the RLP instructed, in relevant part, that:

> To the gross PVC will be added: . . .
>
>> d. The cost of relocation of furniture, telecommunications, replications costs, and other move-related costs, if applicable.
>>
>> e. The fees for architectural and engineering (A/E) services and the Offeror's project management fees associated with Tenant Improvements. The Offeror is required as part of their offer to identify on GSA Form 1364 any and all fees to complete the tenant improvements, broken down into two components: (1) Fees for architectural and engineering design services (A/E fees), which may be offered as a rate per ABOA SF, percentage rate, or flat fee, and (2) Lessor's overhead, administrative costs, profit, and fees associated with Tenant Improvements (Lessor's PM fees), which may be only offered as a percentage rate.  These fees will be evaluated in a multi-step process, as follows:

> o   The A/E fees are assumed to consume a portion of the total tenant
>     improvement allowance (TIA), thus reducing the amount available for
>     actual construction.  The percentage is not a percentage of the TIA, but
>     a percentage of the underlying costs, which together with the A/E fee
>     equals the TIA . . . .

*Id.*  The RLP instructed that the sum of the gross PVC plus additional relevant inputs would be divided by the ABOA SF to equal the present value costs ("PVC") per ABOA SF for price evaluation purposes.  AR 22.

Aside from pricing, the RLP contained an additional requirement relevant to the instant protest.  The Lease Form attached to the RLP incorporated several Federal Acquisition Regulation ("FAR") provisions applicable to the construction of the shell building and TIs that imposed, among other things, the requirement that offerors pay Davis-Bacon Act wage rates where applicable.  *See* AR 1101 (Lease Labor Standards); *see also* AR 426 (citing FAR 52.222-4 Contract Work Hours and Safety Standards Act – Overtime Compensation, 52.222-5 Construction Wage Rate Requirements – Secondary Site of the Work, and 52.222-6 Construction Wage Rate Requirements), AR 488 (DOL Wage Determination).  The Davis-Bacon Act sets forth minimum wage requirements for laborers and mechanics performing contracts in excess of $2,000 for the construction, alteration, or repair of public buildings or public works.  *See* 40 U.S.C. § 3142(a).  The Department of Labor promulgates regulations implementing the Davis-Bacon Act, which federal agencies must follow.  *See* 29 C.F.R. §§ 1.1, 5.1.

## B.   Evaluation and Initial Award

Proposals were due to GSA on December 9, 2019.  AR 15.  GSA received two timely lease proposals: one from Middleburg, who is the incumbent lessor, and the other from Michael Downing.  *See* AR 30–35.  Michael Downing proposed to construct a new building on land next to Middleburg's incumbent property.  AR 62.  After several rounds of negotiations, GSA requested

and received Final Proposal Revisions on March 2, 2020.  AR 323–28.  However, the completion of National Environmental Policy Act and National Historical Preservation Act reviews significantly delayed the procurement until July 18, 2022.  *See, e.g.*, AR 354–64.  As a result, GSA provided Middleburg and Michael Downing an opportunity to update their proposals with any changes by July 25, 2022.  *See* AR 377–78.  Middleburg revised its proposal by reducing the proposed shell rent, while Michael Downing made no changes.  AR 378.

The Agency then conducted a present value analysis ("PVA") of each proposal and determined that Michael Downing presented the lowest-priced, technically acceptable offer.  AR 387–88 (Michael Downing PVA), 394–95 (Middleburg PVA).  In its Motion, the Government represents that around August 2022 the SSA delayed signing the Award Occupancy Agreement and requested GSA delay the lease award because, at a nationwide level, the SSA was pulling back on new and replacement projects and requesting instead that GSA negotiate 10-year, 5-year firm, succeeding leases with incumbent lessors.  Def.'s Mot. for J. on Admin. R. at 9, ECF No. 22.  The Government represents that GSA informed the SSA that it could not award a succeeding lease in this instance since a lower-priced offer was available.  *Id.*

In October 2022, GSA prepared an Independent Government Cost Estimate ("IGCE") for TI costs associated with a non-incumbent space.  *See* AR 566 (IGCE summary sheet showing estimated cost of construction at award to be $781,807); *see also* AR 1052–61 (IGCE summary sheet attaching Cost Estimate Workbook).  The IGCE summary sheet identifies the estimate type as a "Funding/Budgetary IGCE," with a variance of +/- 30 percent.  AR 566.  The summary sheet also notes that the Agency prepared a separate quote for estimated BSAC costs of $145,518.57. *Id.*; *see also* AR 1055–58.  These figures combined represent the estimated replication (or "build-out") costs.  Oral Arg. Tr. at 59:25–60:9, ECF No. 29.  GSA used these estimates in a Cost-Benefit

Analysis ("CBA").  AR 402.  The CBA dated November 1, 2022, showed a savings of $2.1 million over the course of the lease under an award to Michael Downing.  *Id.*

On January 20, 2023, the SSA allowed GSA to move forward with the proposed new lease. ECF No. 22 at 9.  On February 13, 2023, GSA notified Middleburg that it awarded the lease to Michael Downing.  AR 500.

### C.     Protests at the GAO and Agency Reevaluations

Middleburg timely filed a protest with the Government Accountability Office ("GAO") on February 21, 2023, primarily challenging GSA's decision not to include relocation and replication costs in its price evaluation.[2]  AR 501–09; *see also* AR 510–15.  On May 31, 2023, the GAO sustained Middleburg's protest, explaining:

> Michael Downing's proposal was for new construction on land next to the incumbent protestor's property. Therefore replication and moving costs would necessarily be incurred by the [A]gency in the event of an award to Michael Downing.  Here, however, the contemporaneous record is devoid of a meaningful explanation for the [A]gency's position that relocation and replication costs were "not applicable" and therefore need not have been included in the present value analysis . . . .  In light of this lack of explanation, we cannot find the [A]gency's interpretation of the RLP to be reasonable.  As noted above, the [S]olicitation expressly called for such costs to be included in the present value analysis, if applicable.

AR 519–20 (internal citations omitted).  However, since the awarded lease did not have a termination for convenience clause, the GAO recommended the Agency reimburse Middleburg for its proposal preparation costs as well as the costs of filing and preparing its protest.  AR 522.

On June 6, 2023, Middleburg filed a Pre-Filing Notice of Intent to file a bid protest in this Court seeking injunctive relief.  *See* AR 1036.  GSA agreed to take corrective action by

---

[2] Relocation costs are also commonly referred to as moving costs.

reevaluating the offers, this time taking into account relocation and replication costs as required by the GAO's decision, and making a new award decision if appropriate.  *Id.*

Between June 14 and July 17, 2023, GSA reevaluated both offers, running new PVAs that resulted in the same PVC figures as initially computed.  AR 539.  As the Contracting Officer explained, the GSA region handling the instant procurement "does not add additional costs to the PVA, but rather utilizes other methods to ascertain whether the added costs would change the award decision based on the PVA alone."  *Id.*  As the Court understands it, this additional analysis is reflected in a Cost-Benefit Analysis dated June 20, 2023.  *Compare* AR 541 (identifying Tab 5 as "Succeeding Lease Analysis Tool SSA Middleburg Heights") *with* AR 569 (Tab 5, titled "Formal Cost Benefit Analysis").

Upon reevaluation, the Agency made several corrections to the CBA it initially created. AR 539; *see* AR 569 ("Revised CBA").  One of the corrections incorporated the IGCE's estimated build-out costs.  The Agency's Revised CBA shows a combined estimate of $927,325.57 for TI/BASC costs (including $781,807 for TI costs and $145,518.57 for BSAC costs).  AR 569. Another correction removed the amortized TI allowance amount specified in the RLP ($287,283) from the total TI/BSAC costs, resulting in a total replication cost estimate of $640,042.57.  *Id.*; *see* AR 539 (explaining that amortized TIs should be subtracted because "that rent is included in the total annual rent").  The Agency then added in an estimated $55,630 in relocation costs, as well as the non-incumbent's proposed rent payments over the term of the lease.  AR 569.  The results showed that Michael Downing's proposal saved $291,868 over Middleburg's offer.  *Id.*; *see* AR 539.  On July 18, 2023, GSA informed the offerors that Michael Downing had again been selected for the lease award.  AR 1036.

Middleburg again filed a protest at the GAO, this time arguing that since the revised PVA for Michael Downing was the exact amount as the original PVA, the Agency could not have considered relocation and replication costs.  AR 531; *see also* AR 1036.  Upon review, GSA determined that it had not properly incorporated relocation and replication costs into the analysis of Michael Downing's offer and informed the GAO that it was taking corrective action, including another reevaluation of the proposals.  AR 525.  The GAO dismissed Middleburg's protest as academic on August 10, 2023.  AR 526–27.

During the second corrective action, the Agency used the PVA worksheet and the estimated additional costs to determine that Michael Downing's PVC per ABOA SF was higher than initially calculated but still the lower-priced offer.  AR 540 (Michael Downing's PVC equaled $31.42 per ABOA SF, compared to Middleburg's PVC of $32.50 per ABOA SF), 567 (Middleburg PVA), 568 (Michael Downing Final PVA).  The Agency informed offerors on August 14, 2023, that Michael Downing had again been selected for award.  AR 540.

Middleburg filed another protest at the GAO on August 24, 2024, this time arguing that GSA relied on outdated costs in its IGCE, incorrectly assumed Davis-Bacon Act wages were not applicable to its estimate, improperly relied on a flawed Cost-Benefit Analysis, failed to adequately document its award decision, and disparately evaluated the offerors' proposals.  AR 528, 532–35.  On November 29, 2023, the GAO determined that the record submitted by GSA was sufficient to justify the award and denied Middleburg's protest on all grounds.  AR 1034–40.

### D.   The Present Protest

On December 15, 2023, Middleburg filed its Complaint in this Court.  *See* Pl.'s Compl., ECF No. 1.  On February 2, 2024, Middleburg filed a Motion for Judgment on the Administrative Record ("MJAR").  *See* Pl.'s Mot. for J. on Admin. R., ECF No. 19.  As it did in the GAO protest,

Middleburg contends that GSA (1) conducted a flawed price analysis by failing to consider Davis-Bacon Act wages in its estimate of replication costs and by otherwise relying on an outdated IGCE and faulty BSAC, (2) arbitrarily used a Cost-Benefit Analysis tool reserved for succeeding leases not new lease procurements, (3) inconsistently and inadequately documented its price evaluation, and (4) disparately evaluated the two offerors' lease proposals. *Id.* at 9. Middleburg asks the Court to set aside the lease award to Michael Downing and order GSA to conduct a reasonable price evaluation. *Id.* at 38–39.

On March 1, 2024, the Government filed a Cross-Motion for Judgment on the Administrative Record ("Cross-MJAR"). *See generally* ECF No. 22. The parties completed briefing on these dispositive motions on March 29, 2024. *See* Pl.'s Reply, ECF No. 24; Def.'s Reply, ECF No. 26. The Court held oral argument on April 12, 2024. As such, the parties' motions are ripe for decision.

## II. LEGAL STANDARDS

### A. Motions for Judgment on the Administrative Record

Rule 52.1(c) governs motions for judgment on the administrative record. Such motions are "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357). Therefore, a genuine dispute of material fact does not prevent the Court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357.

B.      **Bid Protest Standard of Review**

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1).  In such actions, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act ("APA").  *Id.* § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process."  *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error").  A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error."  *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).  An "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa*, 238 F.3d at 1332.

In reviewing an agency's procurement decisions, the Court may not substitute its judgment for that of the agency.  *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v.*

*United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations"). The disappointed bidder "bears a heavy burden," and the contracting officer is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and quotation marks omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983). A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333. "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

## III. DISCUSSION

Middleburg challenges GSA's award to Michael Downing on four grounds, alleging that (1) GSA's price evaluation was flawed; (2) GSA's use of a Cost-Benefit Analysis was arbitrary and capricious; (3) GSA's price evaluation is inconsistent and inadequately documented; and (4) GSA disparately evaluated the offerors' lease proposals. The Court concludes that Middleburg's protest is unavailing on the first two grounds; however, the Court sustains the protest on ground three and finds that the record is insufficient to determine the merits of ground four. Remand without vacatur is therefore appropriate.[3]

---

[3] The parties do not dispute that Middleburg has standing to bring this protest. And since the Tucker Act's "interested party" requirement presents a question of statutory standing that does not implicate this Court's subject-matter jurisdiction, the Court need not make its own preliminary determination of standing before addressing the merits. *See CACI, Inc.-Federal v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023).

**A.      GSA's Price Evaluation Was Not Flawed In the Ways Middleburg Alleges.**

Middleburg argues that GSA's price evaluation was flawed because it failed to account for Davis-Bacon wage rates when assessing Michael Downing's proposal, relied on an outdated IGCE, and relied on an inaccurate assumption when assessing BSAC costs.  ECF No. 19 at 13–26.  For the reasons discussed below, the Court rejects each of Middleburg's challenges.

The RLP instructed GSA to assess offerors' price proposals by conducting a present value price evaluation.  AR 21.  The present value price evaluation method begins by taking an offeror's proposed annual price per office area square foot and then adjusts that price based on certain inputs from the offeror's proposal to determine gross PVC.  *Id.*  To the gross PVC, the Agency adds "[t]he cost of relocation of furniture, telecommunications, replications costs, and other move-related costs, if applicable[,]" and, separately, "[t]he fees for architectural and engineering (A/E) services and the Offeror's project management fees associated with Tenant Improvements."  *Id.*  The Agency then divides the gross PVC plus additions by the ABOA SF to equal the PVC per ABOA SF for price evaluation purposes.  AR 22.  This analysis, which is commonly referred to as a present value analysis (or PVA), provides a single representation of various inputs, such as variation in operating costs, amortizations, and TI overhead costs.  *See* AR 518.  Although it took two reevaluations, GSA determined under this methodology that Michael Downing offered the lowest-price proposal.  AR 568 (Michael Downing Final PVA), 569 (Middleburg PVA).

Middleburg's contention that GSA failed to consider Davis-Bacon Act wages applicable to Michael Downing's proposal is unavailing.[4]  ECF No. 19 at 13–19.  Middleburg's argument

---

[4] In its opening brief, the Government argued that since offerors were not required to quote Davis-Bacon Act wages pursuant to the terms of the RLP, the Agency did not err by failing to consider them in its PVA.  ECF No. 22 at 13–18.  This argument is suspect, as compliance with Davis-Bacon Act wage requirements is both mandated by federal statute and explicitly recognized by FAR provisions incorporated into the Lease Form attached to the RLP.  40 U.S.C. § 3142(a);

relies on the third review criteria listed on the IGCE summary sheet, which the Agency must certify as reviewed before approving the Cost Estimate Workbook. *Id.* at 18 (citing AR 1052). The review criteria listed on the IGCE summary sheet lists the following:

| (Y/N/N/A) | REVIEW CRITERIA |
|---|---|
| | Criteria |
| Y | Per P-120 (choose N if any of these is false): 1) CEW is correct version; 2) CEW rows and columns on Unit Cost tabs are filled out correctly; 3) Lumps sums limited to <10% of total construction cost; 4) Estimate aligns with complexity and phasing per design documents |
| Comment | |
| Y | Consult with past awarded project data. Make sure costs per trade align with past projects. Prioritize using most recent applicable data. Make sure the data resembles project location and buildout type. |
| Comment | |
| N/A | Estimate Line Items (choose N if any of these is false)(N/A for Budgetary Estimates): 1) Markups are appropriate for phase and complexity.; 2) Based on expertise and understanding of project, elements of work match project scope and conditions such as quantity, unit costs, line item descriptions, logistics, and phasing.; 3) Applicable formatting per project phase (per P-120, see table 3-2); 4) Labor and productivity rates >=Davis-Bacon wages and site + market conditions; 5) High cost line items appropriately supported; 6) Per P-120, Construction Contingency is appropriate |
| Comment | |
| Y | Shell/TI Split (choose N if any of these is false)(N/A for no Shell/TI split): 1) Finishes, HVAC, lighting, plumbing, and FP proportions are appropriate; 2) Finishes in common areas outside entry door to Agency space is shell |
| Comment | |
| N/A | Historic and HAZMAT (choose N if any of these is false)(N/A for Leasing/non-historic buildings): 1) Historic review and design have been performed; 2) HAZMAT assessment and design have been performed |
| Comment | |

AR 566; *see also* AR 1052. Middleburg argues that the "N/A" inputted into the summary sheet shows that GSA did not consider Davis-Bacon Act wages when developing the cost estimates for relocation and replication costs. ECF No. 19 at 18 ("[T]he Agency determined that the Davis-Bacon Act was 'Not Applicable' for this budgetary estimate[.]"). Middleburg argues, under this interpretation of the record, that the Agency violated the Davis-Bacon Act and the terms of the RLP when it conducted the revised PVAs. *Id.* at 18–19.

As the Government explained, however, the selection of "N/A" does not equate to a determination that the Davis-Bacon Act does not apply to this procurement or that Davis-Bacon Act wages were not considered in preparing the estimate. ECF No. 22 at 7. The IGCE's review criteria, as shown above, instruct that "N/A" should be listed if the review is being conducted for

29 C.F.R. §§ 1.1, 5.1. Regardless, the Government appears to have abandoned this argument in subsequent briefing, instead focusing on whether the Agency properly considered the impact of Davis-Bacon Act wages in its IGCE for replication costs, which is reflected in the PVA. *See* ECF No. 26 at 5–8.

a budgetary estimate.  AR 566.  The summary sheet clearly identifies the estimate type as a "Funding/Budgetary IGCE."  *Id.*  According to the Government, selecting "N/A" merely means that the preparer was not required to certify whether the specified Estimate Line Items (including the criteria regarding labor rates) were true ("Y") or false ("N"), and thus it makes no representation whatsoever about the preparer's consideration of labor rates.  *See* ECF No. 29 at 66:9–22; ECF No. 26 at 7.  As the Government points out, beyond the IGCE summary sheet, Middleburg has not provided any evidentiary support for its contention that the Agency failed to consider the impact of the Davis-Bacon Act in the replication cost estimate.[5]  The Court agrees.

It is well settled that agency action is entitled to a "presumption of regularity."  *Impresa*, 238 F.3d at 1338 ("Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious . . . .  The litigant challenging that presumption necessarily bears a heavy burden.").  Under the presumption, courts assume, "in the absence of clear evidence to the contrary," that public officers have properly discharged their official duties.  *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926).  In the context of government procurements, the presumption applies equally to government cost estimates.  *Quality Control Int'l, LLC v. United States*, 148 Fed. Cl. 425, 435–36 (2020) (applying presumption of regularity to an internal government estimate).

---

[5] At most, Middleburg points to a position taken in a filing by agency counsel in the third GAO protest, which stated in a footnote that the Davis-Bacon Act was inapplicable to the procurement.  ECF No. 24 at 10 n.3 (citing AR 1205).  The Government's counsel disclaimed that position at oral argument.  ECF No. 29 at 90:21–91:16.  Aside from it being a legally erroneous statement, the Court does not believe that attorney argument suffices as evidence sufficient to carry Middleburg's burden, nor does it alter the Court's interpretation of the IGCE summary sheet.

Accordingly, the Court presumes that GSA's IGCE, based on the Cost Estimate Workbook utilized to calculate TI and BSAC costs in this procurement, complies with the statutory mandate of the Davis-Bacon Act. Middleburg provides no "clear evidence to the contrary," *Chem. Found.*, 272 U.S. at 14–15, to rebut the presumption of regularity afforded to the Agency's estimate. *See First Enter. v. United States*, 61 Fed. Cl. 109, 120 (2004) (rejecting the argument that the protestor "would have been awarded the contract if the agency had not failed to 'assess the veracity and accuracy of its initial estimates'" where the protestor offered no analysis as to why the estimate was inaccurate (internal citations omitted)); *Quality Control*, 148 Fed. Cl. at 435–36 (same).

Middleburg's argument that the IGCE, created in October 2022, was outdated when the Agency's final price evaluation occurred in August 2023 also fails. *See* ECF No. 19 at 21. Middleburg maintains that the Agency's reliance on the IGCE was unreasonable because substantial inflation during the time between the estimate and reevaluation led to a dramatic increase in construction costs and prices. *Id.* But the fact that the IGCE was prepared in October 2022 does not undermine the reasonableness of its use in later evaluations.

As the United States Court of Appeals for the Federal Circuit has recognized, a procuring agency's estimate need not be calculated with "impeccable rigor," although it must not be "tainted by irrational assumptions or critical miscalculations[.]" *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000). Here, the Government correctly points out that there is no requirement—statutory, regulatory, or otherwise—that obligates the Agency to update the IGCE at any particular stage of the procurement or under any particular conditions, nor will the Court graft such a requirement into the RLP. ECF No. 22 at 22. Speculative contentions that the 2022 estimate was stale does not suffice to overcome Middleburg's heavy burden in this protest.

15

In any event, nothing appears inherently irrational about the course GSA charted here.  The record demonstrates that the Agency prepared the IGCE in October 2022, shortly after GSA received the offerors' Final Proposal Revisions, and approximately three months before GSA first awarded the lease to Michael Downing.  *See* AR 500, 566, 1052–61.  The estimate was approximately nine-months old when GSA conducted Michael Downing's final PVA.  Given the significant discretion afforded to procuring agencies, and the relatively contemporaneous nature of the IGCE, the Court will not second guess GSA's continued reliance upon the IGCE throughout the subsequent reevaluations.

Middleburg's contention that the Agency relied on an inaccurate assumption when calculating the costs of BSAC security improvements is likewise without merit.  ECF No. 19 at 19–20.  Middleburg points to a line of the IGCE that estimated the midpoint of construction as October 1, 2023.  *Id.* at 20 (citing AR 1055).  Middleburg argues that GSA knew this assumption was inaccurate when the Agency conducted its final PVA in August 2023 since the Lease Form calls for months of design, approval, and pricing negotiations prior to the commencement of construction.  *Id.* (citing AR 969–70).  The Government concedes that the Agency's assumption was inaccurate but argues that Middleburg has failed to demonstrate any prejudice from this assumption.  ECF No. 22 at 20–21.  Indeed, the Government correctly points out that Middleburg presents no argument explaining how the estimated midpoint of construction for BSAC improvements had any impact on the Agency's price evaluation.  *Id.* at 21 (citing ECF No. 19 at 19–21).

It is well established that the burden falls upon the protestor not only to demonstrate that an agency acted in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, but additionally to establish that the agency's action prejudiced the

protestor.  *See, e.g.*, *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 289 (2022) (finding that the protestor had not met its burden when it failed to offer any argument as to how it was prejudiced by the agency's alleged errors); *see also Sys. Studies & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) ("[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision.  The protestor must show prejudice under the usual standard.").  Since Middleburg has not shown that it was prejudiced by the inaccurate midpoint-of-construction date, the Court finds the Agency's error harmless.

**B.      GSA's Use of a Cost-Benefit Analysis Was Rational.**

Middleburg next challenges GSA's use of a Cost-Benefit Analysis as contrary to applicable GSA regulations.  ECF No. 19 at 26.  According to Middleburg, the General Services Acquisition Manual ("GSAM") "expressly notes that a Cost-Benefit Analysis may only be used to avoid competition and make award to an existing landlord, which in this case would be Middleburg, not Michael Downing."  *Id.* (citing GSAM 570.402-1).  Middleburg misreads the GSAM, as the section it identifies contains no such limitation.

GSAM 570.402-1 explains that, in certain circumstances, GSA should conduct a Cost-Benefit Analysis to determine if competing a succeeding lease is warranted.  *See* GSAM 570.402-1(b)(2) ("If a succeeding lease will exceed the simplified lease acquisition threshold, the contracting officer may enter into the lease . . . [if] [t]he contracting officer identifies potential acceptable locations, but a cost-benefit analysis indicates that award to an offeror other than the present lessor will result in substantial relocation costs or duplication of costs to the Government, and the Government cannot expect to recover such costs through competition."); GSAM 570.402-5 ("If the contracting officer identifies potential acceptable locations through the advertisement or market survey, conduct a cost-benefit analysis following the procedures [of] 570.402-6.").  These

GSAM sections do not speak to, let alone preclude, the use of a Cost-Benefit Analysis *after* a competitive procurement has been initiated.

Here, it appears that GSA created its initial CBA after SSA requested, during the course of the procurement, that the Agency award a succeeding lease to the incumbent lessor, Middleburg. *See* ECF No. 22 at 9; AR 402. This use of the CBA arguably aligns with the GSAM provisions Middleburg relies on and showed that competing the lease award was appropriate. As part of the first reevaluation, GSA created the Revised CBA to account for relocation and replication costs (per the GAO's decision) and determine whether the added costs would change the award decision. *See* AR 539, 569. Nothing in GSAM prevented GSA from doing so, but ultimately GSA agreed that relocation and replication costs had to be added to the PVA pursuant to the RLP. *See* AR 525, 540. Regardless, the final PVA—which formed the basis of the price evaluation—showed Micheal Downing had the lowest-priced proposal. *See* AR 567–69. Thus, based on the record and recognizing the broad discretion that courts afford agencies in the procurement process, the Court finds that GSA's use of a Cost-Benefit Analysis was not prohibited and, whether reasonable or not, did not prejudice Middleburg.

**C.     GSA's Price Evaluation is Inconsistently and Inadequately Documented.**

Middleburg further challenges the sufficiency of the documentation supporting the Agency's final PVA for Michael Downing's proposal. ECF No. 19 at 27. Specifically, Middleburg argues that several values and calculations inputted into the Agency's worksheet are inconsistent with prior PVAs and there is no explanation of how certain inputs factor into the Agency's price evaluation. *Id.* at 27–29. While the Government contends that the Contracting Officer explained the differing values and calculations in a statement submitted in the second GAO protest, Middleburg nonetheless argues that the Contracting Officer failed to link information from

Michael Downing's proposal to the PVA or to explain why some information from prior PVAs appears to be omitted in the final PVA. *See* ECF No. 22 at 24; ECF No. 24 at 22–23.

The Court reviews claims of inadequate documentation under the APA's arbitrary and capricious standard. *See G4S Secure Sols. (USA), Inc. v. United States*, 146 Fed. Cl. 265, 269 (2019). An agency's decision comports with the APA "if the agency 'provided a coherent and reasonable explanation of its exercise of discretion.'" *Id.* (quoting *Impresa*, 238 F.3d at 1332–33). As the Federal Circuit has recognized, the APA does not obligate contracting officers "to provide written explanations for their actions." *Impresa*, 238 F.3d at 1337. Even where one is provided, it "need not be extensive." *Bannum*, 91 Fed. Cl. at 172. Moreover, courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp.*, *Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974). Nonetheless, the record before the Court must provide sufficient clarity as to the challenged agency action to permit "effective judicial review." *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Camp*, 411 U.S. at 142–43); *see Impresa*, 238 F.3d at 1338 (recognizing that in some circumstances an explanation is required for meaningful judicial review).

Here, the record reflects a succession of PVAs conducted by the Agency at various stages of the evaluation as the offerors updated their proposals at the request of GSA and as a result of corrective actions taken after the initial award. AR 36–49, 340–46, 387–400, 568. Upon review, these analyses include detailed breakdowns of cost inputs, which are derived from the offerors' submissions, particularly GSA Forms 1364 and 1217. *See id.*; *see also* AR 1164–68 (GSA Form 1364, Proposal to Lease Space), 1169–71 (GSA Form 1217, Lessor's Annual Cost Statement). On the face of the PVA worksheets alone, it is not possible for the Court to ascertain how the Agency calculated Michael Downing's final PVC or whether it did so pursuant to the present value price

evaluation method described in the RLP.  Comparing the PVA run by the Agency for purposes of the initial award decision and the final PVA run in August 2023, it is clear the Agency omitted certain inputs and calculations in the final PVA and substituted a new lump sum analysis per the second reevaluation.  *Compare* AR 387 *with* AR 568; *see also* ECF No. 19 at 28–29 (including excerpts from PVAs showing inconsistencies).  Since the record does not include native versions of the worksheets, the Court has no way of assessing, nor can it discern, how GSA arrived at the new PVC calculation for Michael Downing's proposal.  And the Contracting Officer's statement submitted in the second GAO protest provides no additional information clarifying the analysis. *See* AR 539–40.

Moreover, although the Court was able to discern the significance of the unlabeled figures in Michael Downing's final PVC (*see* ECF No. 22 at 28 (first excerpt)), the Court is concerned that the Agency used these figures to arrive at an inaccurate new lump sum value, which it then used to calculate the final PVC.  This is because, as the Government explained at oral argument, the new number reflects a "scaling" of the IGCE estimate to account for the fact that the estimate assumed a 5,286-square-foot office space, whereas the RLP called for a maximum of 6,681 ABOA SF.  ECF No. 29 at 75:21–25.  According to counsel, the new number "incorporates the same inputs" as the original number including "TI and BSAC scaled, and then the move costs."  *Id.* 75:25–76:2.  To the Court, however, the math does not appear to add up.  Rather, it appears that the scaled "Total Est Build Out" figure of $988,125.51 only incorporates the scaled TI estimate. AR 568.  If the Agency had scaled the TI *and* BSAC costs, the figure would have totaled $1,172,051.10, which would have resulted in a new number of $940,398.10.[6]

---

[6] The Court's calculations are as follows: ($781,807 x 6,681) / 5,286 = $988,129.51; ($927,325.57 x 6,681) / 5,286 = $1,172,051.10; ($1,172,051.10 + $55,630) - $287,283 = $940,398.10.

Of course, it is possible that the Court's math is wrong. Unlike GSA contracting officers, it has no experience conducting PVAs. But the fact that the Court is left to work out the math on its own only underscores the conclusion that the PVA worksheets in the Administrative Record lack sufficient clarity to permit effective judicial review. *Timken*, 421 F.3d at 1355. A remand to GSA is therefore appropriate to allow the Agency to clarify the inconsistencies between Michael Downing's PVAs; adequately explain its final price evaluation; and, if it made a mistake, to correct its calculations.[7] *See, e.g.*, *Camp*, 411 U.S. at 143; *Impresa*, 238 F.3d at 1338.

**D.    Because the Price Evaluation Was Inadequately Documented, the Court Cannot Meaningfully Review Middleburg's Disparate Evaluation Claim.**

Middleburg lastly argues that in conducting its price evaluation, GSA disparately evaluated the offerors' lease proposals. Middleburg provides three examples to support its position; specifically, that (1) the two offerors' PVAs have different inputs; (2) Middleburg's PVA contains sections that Michael Downing's PVA does not (and vice versa); and (3) even for sections that appear in both offerors' PVAs, the Agency examined more details in Middleburg's PVA than it did in Michael Downing's. *See id.* at 31–34 (including excerpts from PVAs showing differences). Considered together, Middleburg contends that these differences made it impossible for the Agency to fairly and reasonably compare the proposals. *See id.*

---

[7]   Middleburg additionally argues that GSA's price evaluation was insufficiently documented because it failed to explain why there are multiple IGCEs in the record. ECF No. 19 at 29–30 (noting IGCEs of $1,130,638.00, $155,704.87, and $165,199.01). The Court agrees with the Government that the three "total estimates" Middleburg identified as problematic are merely several parts of a whole IGCE dated October 31, 2022. ECF No. 22 at 25 (citing AR 401, 1052–61) (explaining the IGCE's total cost breakdown, cost breakdown of the BSAC, and the cost breakdown for a special requirement for the space). The Government's explanation of a single IGCE is further supported by the date of the estimate (or estimate review) and a time stamp from October 31, 2022, on each page of the estimate. *See* AR 401, 1052–61. The IGCE itself is therefore properly documented. *See Impresa*, 238 F.3d at 1338.

It is well established that procuring agencies "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 383 (2003) (citing *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 569 (2000)), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004); *see also PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004) ("[U]neven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion."), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).  To prevail on a disparate treatment claim involving the subjective evaluation of proposals, a protestor must show that its proposal was "'substantively indistinguishable' or nearly identical" to a competitor's proposal but was evaluated differently.  *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).  "When a court is not convinced that the aspects of the proposals brought to its attention are indistinguishable for the purposes of the evaluation, then the exercise crosses the line and involves the second guessing of 'minutiae' which [courts] are not allowed to undertake[.]" *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (1996)).

Since Middleburg proposed an existing office space and Michael Downing proposed new construction, it would be entirely reasonable for the Agency's PVAs for the offerors to diverge— both in the inputs themselves (which come from the offerors' proposals) and the calculations necessary to determine each offeror's PVC.  However, at the initial award stage, Middelburg's and Michael Downing's PVAs had the same format and considered the same types of inputs.  *Compare* AR 387 *with* AR 394.  As explained above, in the most recent reevaluation, the Agency changed the format for Michael Downing's final PVA, omitting certain types of inputs and substituting certain analyses.  *See* AR 568.  Because the Court cannot assess on the face of the PVAs in the

Administrative Record how the Agency used the inputs in each PVA to calculate the final PVCs, it is not possible for the Court to determine whether the Agency conducted its price evaluation in accordance with the RLP, as the Government argues, or, as Middleburg argues, disparately evaluated the offerors.   Remand is thus appropriate on this ground to allow the Agency to adequately explain its price evaluation.

**E.    Remand Without Vacatur, Rather Than Injunctive Relief, Is Warranted.**

Since the Court sustains Middleburg's protest on the basis of inadequate documentation, it must address the appropriate relief to be afforded.  Middleburg requests the Court permanently enjoin the award to Michael Downing, and require GSA to conduct a reasonable price evaluation and issue a new award if appropriate.  *See* ECF No. 19 at 38–39.  Middleburg's documentation argument seems to be that the Agency's failure to adequately document its price evaluation is itself proof that the evaluation lacked a rational basis.  *See id.* at 30–31.  But it is not necessarily correct that a failure to adequately document an agency action renders the action arbitrary and capricious per se.

Where an agency's failure to adequately explain a decision precludes effective judicial review, the typical remedy is to order the decision-maker to provide further explanation before determining the validity of the decision on the merits.  *See, e.g.*, *Camp*, 411 U.S. at 142–43; *Impresa*, 238 F.3d at 1338.  Courts may order a remand without vacatur in such circumstances.  *See, e.g.*, *Point Blank Enters., Inc. v. United States*, 168 Fed. Cl. 676, 689 (2023); *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 83 (2022); *Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 311 (2021).  That is the appropriate remedy here, where GSA's further explanation of the PVAs could demonstrate that its price evaluation was rational.  *See Nat'l Org. of Veterans' Advocates v. Sec'y of Veterans Aff.*, 260 F.3d 1365, 1380 (2001).   The Court

additionally finds that a remand can be completed expeditiously, and that the balance of equities favors a limited remand over the issuance of a permanent injunction.

## IV.  CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Middleburg's Motion for Judgment on the Administrative Record (ECF No. 19) and **DENIES** the Government's Cross-Motion for Judgment on the Administrative Record (ECF No. 22).

Pursuant to 28 U.S.C. § 1491(b)(2) and RCFC 52.2(a), this matter is **REMANDED** to GSA to further explain its price evaluation consistent with this opinion and to confirm there is no error in the calculation of Michael Downing's final PVA.  The Court provides the following directions to the parties on remand:

1) The duration of the remand is **21 days** from the date of this opinion, or until **September 6, 2024**.

2) The administrative record on remand shall include native versions of the PVA worksheets beginning at AR 387, 394, 567, and 568, as well as any new worksheets created during remand, and/or a declaration by the appropriate agency official describing how GSA calculated the final PVC of each offeror and the reasons why the worksheet at AR 568 does not follow the same format (or include the same inputs and calculations) as the other PVAs.[8]  If the Agency determines that it made any errors in the calculation of Michael Downing's final PVC, it shall provide a corrected PVA worksheet and explain the nature of the error and correction.

3) The Clerk's office is directed to **STAY** this case until further order of the Court.

---

[8] Native versions of the spreadsheets may be filed by mailing or delivering a portable disc or drive containing the spreadsheets to the Clerk of Court of the United States Court of Federal Claims.

4) Pursuant to RCFC 52.2(e), the parties shall file a Joint Status Report within **7 days** after the conclusion of remand proceedings that sets forth the parties' positions regarding whether further litigation in this matter is necessary.  If further proceedings are appropriate, the parties shall include a proposed schedule to govern this case going forward.

The Clerk is directed to serve a copy of this Order on the GSA at:

> Kovas I. Palubinskas
> Lease Contracting Officer
> Real Estate Division
> General Services Administration
> 230 S. Dearborn Street, Suite 3300
> Chicago, IL 60604

This opinion and order will be unsealed in its entirety after August 27, 2024, unless the parties submit **by no later than August 23, 2024**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: August 16, 2024                             */s/ Kathryn C. Davis*
                                                   KATHRYN C. DAVIS
                                                   Judge